Sheehan & Associates, P.C.
Spencer Sheehan
505 Northern Blvd Ste 311
Great Neck NY 11021-5101
Telephone: (516) 303-0552
Fax: (516) 234-7800
*spencer@spencersheehan.com*


Reese LLP
Michael R. Reese
100 W 93rd St Fl 16
New York NY 10025-7524
Telephone: (212) 643-0500
Fax: (212) 253-4272
*mreese@reesellp.com*

United States District Court
Eastern District of New York                                1:20-cv-01699

| | |
|---|---|
| George Buonocore, individually and on behalf of all others similarly situated, | |
| Plaintiff, | |
| - against - | Complaint |
| Aldi Inc., | |
| Defendant | |

Plaintiff by attorneys allege upon information and belief, except for allegations pertaining to plaintiff, which are based on personal knowledge:

1.    Aldi Inc. ("defendant") manufactures, distributes, markets, labels and sells non-dairy coffee creamer made from almonds and purporting to be flavored only with vanilla, under the Friendly Farms brand ("Product").

2.    The Product is available to consumers from defendant's retail stores and is sold in bottles of 1 pint (16 OZ).

3.    The front label of the tins and packets are identical except for the net weight and

serving size.

4.    The relevant representations include "Friendly Farms," "Vanilla," "Almondmilk,"

"Non-Dairy Creamer" and a vignette of vanilla beans and a vanilla flower.



5.    The Product is misleading because although labeled as "Vanilla," it is has less vanilla

than the label represents and what consumers taste as vanilla is actually non-vanilla flavors.

I.   Increase in Consumption of Non-Dairy, Plant-Based Milk Alternatives

6.     Over the past ten years, the number of dairy milk substitutes has proliferated to include "milks" (milk-like beverages) made from various agricultural commodities.

7.     Reasons for consuming non-dairy milks include avoidance of animal products due to health, environmental or ethical reasons, dietary goals or food allergies.[1]

8.     Two of the most popular milk alternatives are made from soybeans and almonds.

9.     Reasons for consumers choosing soymilk instead of almond milk include tree nut allergies, creamier consistency, greater amount of soy protein and more B vitamins, magnesium and potassium.[2]

10.    Reasons for consumers choosing almond milk instead of soymilk include soy allergies, sweeter taste, similar consistency to skim and low-fat milk, nutty flavor and higher levels of vitamin E.

11.    Recent studies indicate that of the 7.2 million U.S. adults with food allergies, 3 million are allergic to tree nuts while 1.5 million are allergic to soy.[3]

12.    Whether due to few people being allergic to soy and tree nuts (almonds) or the different qualities of each product type, consumers have preferences for one over the other and seldom switch between their "plant milk" of choice.

13.    These plant-based beverages are typically mixed with a flavoring like vanilla or chocolate to increase its palatability and are available in sweetened and unsweetened varieties.

---

[1] Margaret J. Schuster, et al. "Comparison of the Nutrient Content of Cow's Milk and Nondairy Milk Alternatives: What's the Difference?," *Nutrition Today* 53.4 (2018): 153-159.
[2]  Yahoo Food, Almond Milk Vs. Soy Milk: Which Is Better?, September 5, 2014.
[3] Ruchi Gupta et al., "Prevalence and severity of food allergies among US adults," JAMA network open 2, no. 1 (2019): e185630-e185630.

II.    Plant-Based Creamer Products

14.    As consumers have embraced a variety of plant-based milks, their expectations for its use have increased as well.

15.    Since traditional milk is often replaced with dairy creamers due to its thickness when paired with coffee, it is no surprise that the growing preference for plant-based milks means greater desire for plant-based creamers.

16.    These non-dairy creamers have different functional properties than their milk counterparts because they are significantly thicker and creamier.

17.    According to market research firm Datassential, over 50% of people surveyed use creamers instead of milk (traditional or plant-based), whether consuming coffee at home or away.[4]

18.    According to one industry executive, non-dairy creamers "give[s] retailers a fresh way to appeal to their health-conscious and millennial-minded customers, while also helping the millions of Americans who put cream in their coffee move away from the unhealthy artificially flavored, oil-based non-dairy creamers of the past."[5]

19.    Further, 83% of consumers are interested in using plant-based creamers because "consumers tend to believe plant-based creamers are healthier, more natural and taste better than dairy-based options," making them a perfect fit for coffee.[6]

I.    Vanilla is Constantly Subject to Efforts at Imitation Due to High Demand

20.    The tropical orchid of the genus Vanilla (*V. planifolia*) is the source of the prized flavor commonly known as vanilla, defined by law as "the total sapid and odorous principles

---

[4] Beth Newhart, Trend alert: Plant-based creamers pick up as coffee category evolves, Nov. 28, 2018, Beveragedaily.com.
[5] Mary Ellen Shoup, Non-dairy creamer market growth driven by new flavors, Technomic says, Mar. 20, 2017, DAIRYreporter.com
[6] Newhart, *Id*.

extractable from one-unit weight of vanilla beans."[7]

21.    Vanilla's "desirable flavor attributes…make it one of the most common ingredients used in the global marketplace, whether as a primary flavor, as a component of another flavor, or for its desirable aroma qualities."[8]

22.    Though the Pure Food and Drugs Act of 1906 ("Pure Food Act") was enacted to "protect consumer health and prevent commercial fraud," this was but one episode in the perpetual struggle against those who have sought profit through sale of imitation and lower quality commodities, dressed up as the genuine articles.[9]

23.    It was evident that protecting consumers from fraudulent vanilla would be challenging, as E. M. Chace, Assistant Chief of the Foods Division of the U.S. Department of Agriculture's Bureau of Chemistry, noted "There is at least three times as much vanilla consumed [in the United States] as all other flavors together."[10]

24.    This demand could not be met by natural sources of vanilla, leading manufacturers to devise clever, deceptive and dangerous methods to imitate vanilla's flavor and appearance.

25.    Today, headlines tell a story of a resurgent global threat of "food fraud" – from olive oil made from cottonseeds to the horsemeat scandal in the European Union.[11]

26.    Though "food fraud" has no agreed-upon definition, its typologies encompass an

---

[7] 21 C.F.R. §169.3(c).

[8] Daphna Havkin-Frenkel, F.C. Bellanger, Eds., Handbook of Vanilla Science and Technology, Wiley, 2018.

[9] Berenstein, 412; some of the earliest recorded examples of food fraud include unscrupulous Roman merchants who sweetened wine with lead.

[10] E. M. Chace, "The Manufacture of Flavoring Extracts," Yearbook of the United States Department of Agriculture 1908 (Washington, DC: Government Printing Office, 1909) pp.333–42, 333 quoted in Nadia Berenstein, "Making a global sensation: Vanilla flavor, synthetic chemistry, and the meanings of purity," History of Science 54.4 (2016): 399-424 at 399.

[11] Jenny Eagle, 'Today's complex, fragmented, global food supply chains have led to an increase in food fraud', FoodNavigator.com, Feb. 20, 2019; M. Dourado et al., Do we really know what's in our plate?. Annals of Medicine, 51(sup1), 179-179 (May 2019); Aline Wisniewski et al., "How to tackle food fraud in official food control authorities in Germany." Journal of Consumer Protection and Food Safety: 1-10. June 11, 2019.

ever-expanding, often overlapping range of techniques with one common goal: giving consumers less than what they bargained for.

A. Food Fraud as Applied to Vanilla

27.    Vanilla is considered a "high-risk [for food fraud] product because of the multiple market impact factors such as natural disasters in the source regions, unstable production, wide variability of quality and value of vanilla flavorings," second only to saffron in price.[12]

28.    The efforts at imitating vanilla offers a lens to the types of food fraud regularly employed across the spectrum of valuable commodities in today's interconnected world.[13]

| Type of Food Fraud | Application to Vanilla |
| --- | --- |
| ➢ Addition of markers specifically tested for instead of natural component of vanilla beans | • Manipulation of the carbon isotope ratios to produce synthetic vanillin with similar carbon isotope composition to natural vanilla |
| | • Ground vanilla beans and/or seeds to provide visual appeal as "specks" so consumer thinks the product contains real vanilla beans, when the ground beans have been exhausted of flavor |
| ➢ Appearance of *more* and/or higher quality of the valued ingredient | • Caramel to darken the color of an imitation vanilla so it more closely resembles the hue of real vanilla[14] |
| | • Annatto and turmeric extracts in dairy products purporting to be flavored with vanilla, which causes the color to better resemble the hue of rich, yellow butter |

---

[12] Société Générale de Surveillance SA, ("SGS "), Authenticity Testing of Vanilla Flavors – Alignment Between Source Material, Claims and Regulation, May 2019.

[13] Kathleen Wybourn, DNV GL, Understanding Food Fraud and Mitigation Strategies, PowerPoint Presentation, Mar. 16, 2016.

[14] Renée Johnson, "Food fraud and economically motivated adulteration of food and food ingredients." Congressional Research Service R43358, January 10, 2014.

| | |
|---|---|
| ➢ Substitution and replacement of a high-quality ingredient with alternate ingredient of lower quality | • Tonka beans, though similar in appearance to vanilla beans, are banned from entry to the United States due to fraudulent use<br>• Coumarin, a toxic phytochemical found in Tonka beans, added to imitation vanillas to increase vanilla flavor perception |
| ➢ Addition of less expensive substitute ingredient to mimic flavor of more valuable component | • Synthetically produced ethyl vanillin, from recycled paper, tree bark or coal tar, to imitate taste of real vanilla |
| ➢ Compounding, Diluting, Extending | • "to mix flavor materials together at a special ratio in which they [sic] compliment each other to give the desirable aroma and taste"[15]<br>• Combination with flavoring substances such as propenyl guaethol ("Vanitrope"), a "flavoring agent [, also] unconnected to vanilla beans or vanillin, but unmistakably producing the sensation of vanilla"[16]<br>• "Spiking" or "fortification" of vanilla through addition of natural and artificial flavors including vanillin, which simulates vanilla taste but obtained from tree bark |
| ➢ Addition of fillers to give the impression there is more of the product than there actually is | • Injection of vanilla beans with mercury, a poisonous substance, to raise the weight of vanilla beans, alleged in *International Flavors and Fragrances (IFF), Inc. v. Day Pitney LLP and Robert G. Rose,* 2005, Docket Number L-4486-09, Superior Court of New Jersey, Middlesex County |

---

[15] Chee-Teck Tan, "Physical Chemistry in Flavor Products Preparation: An Overview" in Flavor Technology, ACS Symposium Series, Vol. 610 1995. 1-17.
[16] Berenstein, 423.

- Subtle, yet deliberate misidentification and obfuscation of a product's components and qualities as they appear on the ingredient list
  - "ground vanilla beans" gives impression it describes unexhausted vanilla beans when actually it is devoid of flavor and used for aesthetics
  - "natural vanilla flavorings" – "-ing" as suffix referring to something *like* that which is described
  - "Vanilla With Other Natural Flavors" – implying – wrongly – such a product has a sufficient amount of vanilla to characterize the food
  - "Natural Flavors" – containing "natural vanillin" derived not from vanilla beans but from tree pulp. When paired with real vanilla, vanillin is required to be declared as an artificial flavor
  - "Non-Characterizing" flavors which are not identical to vanilla, but that extend vanilla

➢ Ingredient List Deception[17]

29.    The "plasticity of legal reasoning" with respect to food fraud epitomize what H. Mansfield Robinson and Cecil H. Cribb noted in 1895 in the context of Victorian England:

> the most striking feature of the latter-day sophisticator of foods is his knowledge of the law and his skill in evading it. If a legal limit on strength or quality be fixed for any substance (as in the case of spirits), he carefully brings his goods right down to it, and perhaps just so little below that no magistrate would convict him.
>
> *The law and chemistry of food and drugs*. London: F.J. Rebman at p. 320.[18]

II.    Flavor Industry's Efforts to Use Less Vanilla, Regardless of any Shortages

30.    The "flavor industry" refers to the largest "flavor houses" such as Symrise AG,

---

[17] Recent example of this would be "evaporated cane juice" as a more healthful sounding term to consumers to identify sugar.
[18] Cited in Sébastien Rioux, "Capitalist food production and the rise of legal adulteration: Regulating food standards in 19th-century Britain," Journal of Agrarian Change 19.1 (2019) at p. 65 (64-81).

Firmenich, Givaudan, International Flavors and Fragrances (including David Michael), Frutarom and Takasago International along with the largest food manufacturing companies such as Unilever.

31.     The recent global shortage of vanilla beans has provided the flavor industry another opportunity to "innovate[ing] natural vanilla solutions…to protect our existing customers."[19]

32.     Their "customers" do not include the impoverished vanilla farmers nor consumers, who are sold products labeled as "vanilla" for the same or higher prices than when those products contained *only* vanilla.

33.     These efforts include (1) market disruption and manipulation and (2) the development of alternatives to vanilla which completely or partially replace vanilla.

A.     <u>Attempts to Disrupt Supply of Vanilla to Create a "Permanent Shortage"</u>

34.     The flavor industry has developed schemes such as the "Sustainable Vanilla Initiative" and "Rainforest Alliance Certified," to supposedly assure a significant supply of vanilla at stable, reasonable prices paid to the farmers.

35.     However, these programs make vanilla less "sustainable" by paying farmers to destroy their vanilla plants and produce palm oil under the pretense of "crop diversification."

36.     Other tactics include "phantom bidding," where "deep-pocketed" saboteurs claim they will pay a higher price to small producers, only to vanish, leaving the farmers forced to sell at bottom dollar to remaining bidders.[20]

37.     The reasons for these counterintuitive actions is because the flavor industry benefits from high vanilla prices and the use of less real vanilla.

38.     When less vanilla is available, the customers of the flavor companies – food

---

[19] Amanda Del Buouno, <u>Ingredient Spotlight</u>, Beverage Industry, Oct. 3, 2016.
[20] Monte Reel, <u>The Volatile Economics of Natural Vanilla in Madagascar</u>, Bloomberg.com, Dec. 16, 2019.

manufacturers – must purchase the higher margin, proprietary, "vanilla-like" flavorings made with advanced technology and synthetic biology.

B.  Promotion of Imitation Vanilla Instead of Real Vanilla

39.    For decades, the trade group, The Flavor and Extract Manufacturers Association ("FEMA"), was in charge of "self-policing" and preventing manufacturers and flavor suppliers from misleading vanilla labeling which deceived consumers.

40.    However, FEMA was forced to abandon this "self-policing" and disbanded its Vanilla Committee due to financial pressure from its largest members such as Givaudan, Firmenich, Danone, Unilever and Nestle.

41.    Though flavor companies will not admit their desire to move off real vanilla, this conclusion is consistent with the comments of industry executives.

42.    According to Suzanne Johnson, vice president of research at a North Carolina laboratory, "Many companies are trying to switch to natural vanilla with other natural flavors [WONF] in order to keep a high-quality taste at a lower price," known as "Vanilla WONF."

43.    The head of "taste solutions" at Irish conglomerate Kerry plc, urged flavor manufacturers to "[G]et creative" and "build a compounded vanilla flavor with other natural flavors."

44.    A compounded vanilla flavor "that matches the taste of pure vanilla natural extracts" can supposedly "provide the same vanilla taste expectation while requiring a smaller quantity of vanilla beans. The result is a greater consistency in pricing, availability and quality."[21]

45.    These compounded flavors exist in a "black box" with "as many as 100 or more flavor ingredients," including "naturally produced vanillin," potentiators and enhancers, like

---

[21] Donna Berry, Understanding the limitations of natural flavors, BakingBusiness.com, Jan. 16, 2018.

maltol and piperonal, blended together to enhance the vanilla, allowing the use of less vanilla to achieve the intended taste.[22]

46.    The numerous "naturally produced vanillins" are just as potent as their synthetic predecessors, such that "one ounce of vanillin is equal to a full gallon of single-fold vanilla extract."[23]

47.    The marketplace has been flooded with "Vanilla WONF" ingredients containing "natural vanillin."[24]

48.    However, according to John B. Hallagan and Joanna Drake, former and present legal counsel for The Flavor and Extract Manufacturers Association of the United States ("FEMA"), the use of these flavor combinations, when labeled "Vanilla With Other Natural Flavor" misbrands the items:

> The standards for vanilla extract and the other standardized vanilla products at 21 CFR 169 expressly do not provide WONF designation. This means that a flavoring mixture of vanilla extract and vanillin produced through a "natural" process (i.e. a process consistent with the definition of natural flavor at 21 CFR Section 101.22(a) (3)) cannot be described as "vanilla extract WONF," "vanilla WONF" or other similar descriptive terms.
>
> John B. Hallagan and Joanna Drake, The Flavor and Extract Manufacturers Association of the United States, "Labeling Vanilla Flavorings and Vanilla-Flavored Foods in the U.S.," Perfumer & Flavorist, Vol. 43 at p. 46, Apr. 25, 2018.

III.    Representations are Misleading Because They Misrepresent the Amount, Percentage and Type of Vanilla in the Product

49.    Consumers seek to buy products where the vanilla flavor is only provided from

---

[22] Hallagan and Drake, FEMA GRAS and U.S. Regulatory Authority: U.S. Flavor and Food Labeling Implications, Perfumer & Flavorist, Oct. 25, 2018; Charles Zapsalis et al., *Food chemistry and nutritional biochemistry*. Wiley, 1985, p. 611 (describing the flavor industry's goal to develop vanilla compound flavors "That *Seem*[s] to be Authentic or at Least Derived from a Natural Source") (emphasis added).

[23] Katy Severson, Imitation vs. Real Vanilla: Scientists Explain How Baking Affects Flavor, Huffington Post, May 21, 2019.

[24] John B. Hallagan and Joanna Drake, The Flavor and Extract Manufacturers Association of the United States, "Labeling Vanilla Flavorings and Vanilla-Flavored Foods in the U.S.," Perfumer & Flavorist, Apr. 25, 2018.

vanilla beans, and avoid artificial flavors and flavors from sources other than the natural source material for reasons including nutrition, health and/or the avoidance of chemicals and highly processed ingredients.

50. The Product's designation of its characterizing flavor as "Vanilla" without any qualifying terms – flavored, with other natural flavors, artificially flavored – gives consumers the impression that its entire vanilla flavor (taste sensation) is contributed by the characterizing food ingredient of vanilla beans. *See* 21 C.F.R. § 101.22(i)(1) (describing a food which contains no simulating artificial flavor and not subject to 21 C.F.R. § 101.22(i)(1)(i)-(iii)).

51. The unqualified, prominent and conspicuous representations as "Vanilla" is false, deceptive and misleading because the Product contains non-vanilla flavors which imitate and extend vanilla but are not derived from the vanilla bean, yet these flavors are not disclosed to consumers as required and expected.

A.  Designation of Flavoring Ingredient on Ingredient List

52. That the Product contains such non-vanilla flavors is apparent from the ingredient list which designates "Natural Flavor" as the only flavoring ingredient.

**INGREDIENTS:** ALMONDMILK (FILTERED WATER, ALMONDS), CANE SUGAR, PALM OIL, COCONUT OIL, NATURAL FLAVORS, PEA PROTEIN, SODIUM BICARBONATE, GELLAN GUM, GUAR GUM, SEA SALT.

53. This conclusion is reached by analyzing the relevant regulations which control how ingredients are required to be designated. *See* 21 C.F.R. § 101.4(a)(1) ("designation of ingredients").

54. Ingredients subject to standards of identity, like vanilla extract or vanilla flavoring, are required to "be listed by common or usual name." *See* 21 C.F.R. § 101.4(a)(1).

55. The common or usual name of these exclusively vanilla ingredients are specifically

12

provided by their standards of identity. *See* 21 C.F.R. § 169.175(b)(1) ("The specified name of the food is 'Vanilla extract' or 'Extract of vanilla'."); *see also* 21 C.F.R. § 169.177(b) ("The specified name of the food is 'Vanilla flavoring.'").

56.    However, just because an ingredient list does not identify vanilla extract or vanilla flavoring does not mean the food lacks vanilla.

57.    When a flavor is manufactured which contains some vanilla and other non-vanilla natural flavors, it is designated "natural flavor." *See* 21 C.F.R. § 101.22(h)(1) ("Spice, natural flavor, and artificial flavor may be declared as 'spice', 'natural flavor', or 'artificial flavor', or any combination thereof, as the case may be.").

58.    The Product's "natural flavor" is an ingredient designated in the trade as "Vanilla With Other Natural Flavor."

59.    A "WONF" flavor contains some flavor "from the product whose flavor is simulated and other natural flavor which simulates, resembles or reinforces the characterizing flavor." *See* 21 C.F.R. § 101.22(i)(1)(iii)

60.    The correct labeling of a food containing a WONF flavor is described in 21 C.F.R. § 101.22(i)(1)(iii):

> If the food contains both a characterizing flavor from the product whose flavor is simulated and other natural flavor which simulates, resembles or reinforces the characterizing flavor, the food shall be labeled in accordance with the introductory text and paragraph (i)(1)(i) of this section and the name of the food shall be immediately followed by the words "with other natural flavor" in letters not less than one-half the height of the letters used in the name of the characterizing flavor.

61.    For a food containing a non-vanilla WONF, i.e., Strawberry WONF, the front label has two possible flavor designations based on the amount of characterizing flavor from the product whose flavor is simulated.

62.    In a food where the characterizing flavor is strawberry, if the amount of strawberries

is insufficient to independently characterize the food and the food contains strawberry flavor and "other natural flavor" which simulates strawberries, the front label would be required to state "[Name of Characterizing Flavor] Flavored With Other Natural Flavor." *See* 21 C.F.R. § 101.22(i)(1)(iii) referring to "paragraph (i)(1)(i) of this section," 21 C.F.R. § 101.22(i)(1)(i).

63.    In a food where the characterizing flavor is strawberry, if the amount of strawberries is sufficient to independently characterize the food and the food contains "other natural flavor" which simulates strawberries, the front label would be required to state "[Name of Characterizing Flavor] With Other Natural Flavor." *See* 21 C.F.R. § 101.22(i)(1)(iii); *see also* 21 C.F.R. § 101.22(i)(1) ("introductory text" describing a food containing "no artificial flavor which simulates, resembles or reinforces the characterizing flavor," and none of the sub-paragraphs of 21 C.F.R. § 101.22(i)(1) apply).

### B. Even if Product Label Included "With Other Natural Flavor," It would Still be Misleading

64.    This "Vanilla WONF" is used because it allows a company to use less real vanilla, a higher quality ingredient valued by consumers.

65.    By adding "Other Natural Flavors" to a standardized exclusively vanilla ingredient – vanilla extract or vanilla flavoring – consumers are not receiving the same high quality and expensive ingredient and are unaccustomed to such a pairing.

66.    The standards of identity for vanilla ingredients do not allow the addition of non-vanilla natural flavors.

67.    For instance, vanilla extract may contain glycerin, propylene glycol, sugar, dextrose, corn sirup or vanillin. *See* 21 C.F.R. § 169.175(a)(1)-(5) (ingredients permitted for addition to vanilla extract); *see also* 21 C.F.R. § 169.180(a) (permitting "not more than 1 ounce of added vanillin" for "each unit of vanilla constituent, as defined in 169.3(c)" in the combination labeled

"Vanilla-vanillin extract.").

68.    Had the Product's label contained "With Other Natural Flavors," consumers would be misled because such a description fails to specify how much of the Product's flavor is from vanilla vis-à-vis non-vanilla flavors.  Exhibit A, Letter from FDA to Ernie Molina, Warner-Jenkinson Company of California, January 17, 1980 ("the general principles of 21 CFR 102.5 should apply" and proportions of each component should be disclosed, i.e., "contains 50% vanilla extract and 50% non-vanilla flavors" or otherwise disclose the proportions.).

69.    A more accurate description of the flavor used in the Product can be determined after defendant supplies the flavor formula and composition to plaintiff in expedited discovery.

70.    To the extent a food containing "Vanilla WONF" contains vanillin produced through a natural process, it would be deceptive to describe such a product through use of the "Other Natural Flavor" term because in the context of vanilla, vanillin has never been a "natural flavor."

IV.    Conclusion

71.    The source of a food's flavor – from the characterizing food ingredient, a flavor derived from the characterizing ingredient, a natural source unrelated to the characterizing flavor or an artificial source – is material to consumers.

72.    Defendant's branding and packaging of the Product is designed to – and does – deceive, mislead, and defraud plaintiff and consumers.

73.    Defendant sold more of the Product and at higher prices than it would have in the absence of this misconduct, resulting in additional profits at the expense of consumers like plaintiff.

74.    The value of the Product that plaintiff purchased and consumed was materially less than its value as represented by defendant.

75.     Had plaintiff and class members known the truth, they would not have bought the Product or would have paid less for them.

76.     As a result of the false and misleading labeling, the Product is sold at a premium price, approximately no less than $2.89 per 16 OZ (1 pint), excluding tax, compared to other similar products represented in a non-misleading way.

Jurisdiction and Venue

77.     Jurisdiction is proper pursuant to 28 U.S.C. § 1332(d)(2) (Class Action Fairness Act of 2005 or "CAFA").

78.     Under CAFA, district courts have "original federal jurisdiction over class actions involving (1) an aggregate amount in controversy of at least $5,000,000; and (2) minimal diversity[.]" *Gold v. New York Life Ins. Co.*, 730 F.3d 137, 141 (2d Cir. 2013).

79.     Plaintiff George Buonocore is a citizen of New York.

80.     Defendant is a Illinois corporation with a principal place of business in Batavia, Kane County, Illinois and is a citizen of Illinois.

81.     Venue is proper because plaintiff and many class members reside in this District and defendant does business in this District and State.

82.     This court has personal jurisdiction over defendant because it conducts and transacts business, contracts to supply and supplies goods within New York.

83.     A substantial part of events and omissions giving rise to the claims occurred in this District.

Parties

84.     Plaintiff George Buonocore is a citizen of Jamaica, Queens County, New York.

85.     Defendant Aldi Inc. is an Illinois corporation with a principal place of business in

16

Batavia, Illinois, Kane County.

86.    During the relevant statutes of limitations, plaintiff purchased the Product within his district and/or State for personal consumption and/or use in reliance on the representations the Product's vanilla taste was only from real vanilla.

87.    Plaintiff bought the Product because he liked the product type for its intended use and expected the vanilla flavor to only come from real vanilla beans because the front label lacked any reference to the Product being "flavored" nor indicated the presence of other compounds which resembled, simulated and extended any actual vanilla it contained.

88.    Plaintiff would buy the Product again if assured its vanilla taste was only from real vanilla and did not come from non-vanilla sources.

<u>Class Allegations</u>

89.    The class will consist of all purchasers of the Product in New York during the applicable statutes of limitations.

90.    Common questions of law or fact predominate and include whether defendant's representations were and are misleading and if plaintiff and class members are entitled to damages.

91.    Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair and deceptive representations and actions.

92.    Plaintiff is an adequate representatives because his interests do not conflict with other members.

93.    No individual inquiry is necessary since the focus is only on defendant's practices and the class is definable and ascertainable.

94.    Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

95.    Plaintiff's counsel is competent and experienced in complex class action litigation and intends to adequately and fairly protect class members' interests.

96.    Plaintiff seeks class-wide injunctive relief because the practices continue.

### New York General Business Law ("GBL") §§ 349 & 350
### (Consumer Protection Statute)

97.    Plaintiff incorporates by reference all preceding paragraphs.

98.    Plaintiff and class members desired to purchase and consume products which were as described and marketed by defendant and expected by reasonable consumers, given the product type.

99.    Defendant's acts and omissions are not unique to the parties and have a broader impact on the public.

100.  Defendant misrepresented the substantive, quality, compositional, organoleptic and/or nutritional attributes of the Product.

101.  The amount and proportion of the characterizing component, vanilla, has a material bearing on price or consumer acceptance of the Products because consumers are willing to pay more for such Products.

102.  Plaintiff relied on the statements, omissions and representations of defendant, and defendant knew or should have known the falsity of same.

103.  Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

### Negligent Misrepresentation

104.  Plaintiff incorporates by reference all preceding paragraphs.

105.  Defendant misrepresented the substantive, quality, compositional, organoleptic and/or nutritional attributes of the Product.

106. The amount and proportion of the characterizing component, vanilla, has a material bearing on price or consumer acceptance of the Products because consumers are willing to pay more for such Products.

107. Defendant had a duty to disclose and/or provide non-deceptive marketing of the Product and knew or should have known same were false or misleading.

108. This duty is based on defendant's position as an entity which has held itself out as having special knowledge and experience in the production, service and/or sale of the product type.

109. The representations took advantage of consumers' cognitive shortcuts made at the point-of-sale and their trust in defendant, a well-known and respected brand or entity in this sector.

110. Plaintiff and class members reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, the purchase of the Product.

111. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

### Breaches of Express Warranty, Implied Warranty of Merchantability and Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*

112. Plaintiff incorporates by reference all preceding paragraphs.

113. The Product was manufactured, labeled and sold by defendant and warranted to plaintiff and class members that they possessed substantive, functional, nutritional, qualitative, compositional, organoleptic, sensory, physical and other attributes which they did not.

114. The amount and proportion of the characterizing component, vanilla, has a material bearing on price or consumer acceptance of the Products because consumers are willing to pay more for such Products.

115. Defendant had a duty to disclose and/or provide non-deceptive descriptions and

marketing of the Product.

116.   This duty is based, in part, on defendant's position as one of the most recognized companies in the nation in this sector.

117.   Plaintiff provided or will provide notice to defendant, its agents, representatives, retailers and their employees.

118.   Defendant received notice and should have been aware of these misrepresentations due to numerous complaints by consumers to its main office over the past several years regarding the Product, of the type described here.

119.   The Product did not conform to its affirmations of fact and promises due to defendant's actions and were not merchantable.

120.   Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

<u>Fraud</u>

121.   Plaintiff incorporates by reference all preceding paragraphs.

122.   The amount and proportion of the characterizing component, vanilla, has a material bearing on price or consumer acceptance of the Products because consumers are willing to pay more for such Products.

123.   Defendant's fraudulent intent is evinced by its failure to accurately identify the Product on the front labels, when it knew its statements were neither true nor accurate.

124.   Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

20

<u>Unjust Enrichment</u>

125.   Plaintiff incorporates by reference all preceding paragraphs.

126.   Defendant obtained benefits and monies because the Product was not as represented and expected, to the detriment and impoverishment of plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

<u>Jury Demand and Prayer for Relief</u>

Plaintiff demands a jury trial on all issues.

 **WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying plaintiff as representative and the undersigned as counsel for the class;

2. Entering preliminary and permanent injunctive relief by directing defendant to correct the challenged practices to comply with the law;

3. Injunctive relief to remove, correct and/or refrain from the challenged practices and representations, and restitution and disgorgement for members of the class pursuant to the applicable laws;

4. Awarding monetary damages and interest pursuant to the common law and other statutory claims;

5. Awarding costs and expenses, including reasonable fees for plaintiff's attorneys and experts; and

6. Other and further relief as the Court deems just and proper.

Dated:   April 5, 2020

                                                                    Respectfully submitted,

                                                                    Sheehan & Associates, P.C.
                                                                    /s/Spencer Sheehan
                                                                    Spencer Sheehan
                                                                    505 Northern Blvd Ste 311

Great Neck NY 11021-5101
Tel: (516) 303-0552
Fax: (516) 234-7800
*spencer@spencersheehan.com*
E.D.N.Y. # SS-8533
S.D.N.Y. # SS-2056

Reese LLP
Michael R. Reese
100 W 93rd St Fl 16
New York NY 10025-7524
Telephone: (212) 643-0500
Fax: (212) 253-4272
*mreese@reesellp.com*

1:20-cv-01699
United States District Court
Eastern District of New York

George Buonocore, individually and on behalf of all others similarly situated,

Plaintiff,

- against -

Aldi Inc.,

Defendant

## Complaint

```
Sheehan & Associates, P.C.
505 Northern Blvd Ste 311
Great Neck NY 11021-5101
   Tel: (516) 303-0552
   Fax: (516) 234-7800
```

Pursuant to 22 NYCRR 130-1.1, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information, and belief, formed after an inquiry reasonable under the circumstances, the contentions contained in the annexed documents are not frivolous.

Dated:  April 5, 2020

/s/ Spencer Sheehan
Spencer Sheehan